1 F.3d 1250
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Selma JUAREZ, Defendant-Appellant.
 No. 92-2287.
 United States Court of Appeals, Tenth Circuit.
 Aug. 2, 1993.
 
 Before LOGAN, ANDERSON, and TACHA, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Appellant Selma Juarez was charged with conspiring to possess with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. Sec. 846. At her trial, Juarez pled guilty after the United States concluded its case-in-chief. She was sentenced to 54 months of imprisonment, to be followed by three years of supervised release. Juarez appeals her sentence, contending that the district court erred in (1) enhancing her sentence upon a determination that she was a leader or organizer in the criminal enterprise; (2) enhancing her sentence upon a determination that she obstructed justice; and (3) failing to grant her a two-point reduction under the guidelines for acceptance of responsibility. We affirm.
 
 FACTS
 
 2
 Although Juarez takes issue with the conclusions drawn from the facts, there is no dispute with respect to the following specific factual assertions, all of which are found in the pleadings and trial testimony as set forth in Vols. I-IV of the record, and in the Presentence Reports of Juarez, Vol. V, and co-conspirator Linda Scally, Supp.Vol. I, of the record:
 
 
 3
 On November 29, 1991, an Albuquerque-based Drug Enforcement Administration ("DEA") Agent, Robert Schimoler, received information that 800 pounds of marijuana was to be delivered in the Albuquerque area. Based on that information, the DEA conducted a brief surveillance of Juarez' house, where the delivery was to be made. The delivery site was later changed to a location behind the International House of Pancakes in the Four Hills Shopping Center in Albuquerque.
 
 
 4
 At approximately 3:30 a.m. on November 30, 1991, DEA agents observed two women, later identified as Linda Scally and D'Anne Gomez, transferring marijuana from a truck to their respective cars. The two women were arrested shortly after leaving the shopping center. The weight of the marijuana seized from their cars was 541 pounds. Subsequently, a grand jury returned a single count indictment charging Scally and Gomez with possession with intent to distribute more than 50 kilograms of marijuana. Both defendants ultimately entered guilty pleas. The government agreed, by memorandum of understanding, to move for dismissal of the charge against Scally in exchange for her guilty plea because she is afflicted with terminal melanoma cancer.
 
 
 5
 Pressured by her attorney and by her lesbian lover, Maribel Chavez, to cooperate with the government in order to reduce her sentence, Gomez eventually offered to reveal to the government facts about Juarez' involvement in the scheme. She agreed to testify against Juarez and to further implicate her by arranging meetings with Juarez during which Gomez would be equipped with microcassette tape recorder.
 
 
 6
 Gomez testified at trial that Juarez approached her in May of 1991 and asked her if she would drive to Mexico with Scally. According to Gomez, Juarez paid for the trip because "[Scally] was sick and she couldn't drive. And that she [Juarez] couldn't go down with Linda [Scally] because she had been in trouble before." Gomez testified that while in Mexico, Scally met with a man named Lorenzo. Scally and Lorenzo conversed in Spanish and, although Gomez is not fluent in that language, she "could catch bits and pieces" and heard some talk of marijuana.
 
 
 7
 About a month after Gomez and Scally returned from Mexico, Juarez offered to pay Gomez for the use of her shed to store some 20-50 pounds of marijuana that Juarez was expecting from Lorenzo. Juarez told Gomez that "she'd pay [Gomez] ... what she usually paid people" for keeping the marijuana in her shed for two or three days. Several months later, Gomez and her friend Maribel Chavez spent Thanksgiving at Juarez' home. At that time, Juarez stated that the "mule" would be arriving with a shipment of marijuana within a few days. Juarez identified her source as Lorenzo. It was two days later that Gomez helped Scally unload the marijuana from the truck at the shopping center.
 
 
 8
 Gomez further testified that shortly after her arrest, Juarez and Scally took Gomez for a drive during which they "made it real clear that [Gomez] wasn't to tell on them, to stick to the story that Linda [Scally] had made up." The story, according to Gomez, was that "Linda [Scally] was in charge of it and that [Gomez] had a minor role and to blame everything on Linda so Linda could take the fall. And to leave Selma [Juarez] out of it because she couldn't afford to get in trouble because she had been in trouble before." Juarez cautioned Gomez about "snitching" and warned her that she would "always have to be looking over [her] shoulder if [she] told ... [t]he truth." Juarez also offered to pay Gomez, stating that she'd take care of her if she didn't snitch. Gomez testified that Juarez intimidated her into reporting the contrived story to the authorities.
 
 
 9
 Tape recordings of discussions between Juarez and Gomez were played during trial. During a taped conversation on March 17, 1992, Juarez made repeated statements to Gomez regarding Juarez' participation in the drug trafficking scheme. Juarez stated that she understood Lorenzo was going to deliver 50 pounds of marijuana, not the 541 pounds actually delivered. Juarez directed Gomez as to what she was to tell investigating officers regarding Juarez' participation in the offense:
 
 
 10
 Don't let 'em include me, I am not part of this, O.K., let it be--and, if you do that, then they'll come after me, that's why you can't do that. I can't do ten or fifteen years ... O.K. The thing is that the agreement in the first place was that I would have nothing to do with this because I was already on probation, remember.
 
 
 11
 Investigators concluded that Juarez' tone of voice was intimidating and somewhat threatening as she attempted to influence Gomez during this conversation.
 
 
 12
 During a second taped conversation between Gomez, Scally and Juarez on March 23, 1992, Juarez reminded Gomez that she was not to "snitch" and was not to alter her story to investigators. She promised Gomez she would pay her with insurance money, following Scally's death: "[W]hen you get out, ... I have a plan you know. I'll take care of you D'Anne ... whatever I can do, whatever I can give you, I will give you."
 
 
 13
 Gomez' friend, Maribel Chavez, testified that on the morning of Gomez' arrest, Juarez came to her home and informed her that she had scales in her trunk which she need to dispose of. Juarez asked Chavez where the nearest pay phone was located so that she could call Lorenzo. She indicated that she had been working with Lorenzo for several years, but that Lorenzo was not her main source of supply. When she returned to Chavez' home later that afternoon, she stated that if agents connected her to this case, she would flee to Mexico and Lorenzo would take care of her. Juarez also visited Kathleen Salas on the day Gomez and Scally were arrested. She asked Salas to hide two boxes, one containing scales and the other containing drug paraphernalia, in order that Juarez could avoid being implicated in the drug trafficking crime for which Gomez and Scally were arrested. She told Salas that she had ordered marijuana from Lorenzo before. She stated that for this delivery, she thought she had ordered marijuana at a cost of $800 per pound, not 800 pounds of marijuana.
 
 
 14
 Officer Thomas Garduna, an Albuquerque Police Department canine handler, testified that his dog alerted to Juarez' scales, which indicated the presence of controlled substances. Agent Schimoler testified that scales owned by Juarez were of the type commonly used in weighing distribution amounts of marijuana.
 
 
 15
 In the presentence report, the probation officer relied on testimony at trial, interviews with Gomez and others, and the taped conversations between Juarez and Gomez, to conclude that pursuant to U.S.S.G. Sec. 3B1.1(c), Juarez should receive a two-level increase in her offense level because she "directed, organized, led, and managed the marijuana negotiations and importation from Mexico to the United States." He also concluded that, pursuant to U.S.S.G. Sec. 3C1.1, Juarez should receive a two-level increase because she "willfully obstructed, impeded or attempted to obstruct or impede the investigation and prosecution of this offense by directing D'Anne Gomez to purger [sic] herself as well as intimidating or otherwise unlawfully influencing Ms. Gomez." Finally, the probation officer recommended that Juarez not be given a two-level reduction in offense level for acceptance of responsibility because she "minimized her role and participation in the offense, and she forced the U.S. government to go to the expense of a trial while maintaining her innocence."
 
 
 16
 Juarez objected to all three recommendations in the presentence report. However, she did not dispute any of the specific factual assertions in the presentence report, including those set forth above. At the sentencing hearing, the district court made the following oral findings:
 
 
 17
 The Court adopts the factual findings and guideline applications of the pre-sentence report in the addendum and finds there is no need for an evidentiary hearing as there are no other disputed facts.
 
 
 18
 * * *
 
 
 19
 The Court takes judicial notice that the defendant attempted to export 50 pounds of marijuana from Mexico to the United States. She was on probation for a similar offense at the time of the instant offense. The Court also notes that the defendant attempted to intimidate and unlawfully influence a co-conspirator in this case.
 
 DISCUSSION
 
 20
 We review the district court's interpretation and application of the Sentencing Guidelines de novo. United States v. Hershberger, 962 F.2d 1548, 1550 (10th Cir.1992). Factual determinations are reviewed under the clearly erroneous standard. Id.; United States v. Rutter, 897 F.2d 1558, 1560 (10th Cir.), cert. denied, 498 U.S. 829 (1990).
 
 
 21
 Juarez first asserts that the district court failed to comply with Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure. Rule 32(c)(3)(D) provides that if a defendant or his counsel allege a factual inaccuracy in the presentence report, then the district court "shall as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing."
 
 
 22
 In a written memorandum, Juarez made general objections to the conclusions reached by the probation officer as to her leadership role in the conspiracy, her failure to accept responsibility for her actions, and her obstruction of justice. For example, she maintained that (1) Gomez consistently exaggerated Juarez' role while minimizing her own role in the offense; (2) the facts do not support the conclusion that Juarez recruited Gomez; (3) both Gomez and Scally had contact with Lorenzo in Mexico prior to the inception of this offense; and (4) Juarez did not exercise control over the activities of Gomez and did not direct her participation in the offense. At the sentencing hearing, the district court orally adopted the factual findings and guideline applications of the presentence report, and included its adoption in its written judgment. Juarez contends this was not adequate to comply with the requirements of Rule 32(c)(3)(D). We disagree.
 
 
 23
 Juarez has failed to identify any fact contained in the presentence report which she alleges to be inaccurate. Rather, she contests the conclusions that flow from undisputed facts. As we have stated before, " 'only historical, objectively verifiable information reported in the [presentence report] and existing independent of it, can properly be contested as a "fact" under Rule 32.' " United States v. Cox, 934 F.2d 1114, 1126 (10th Cir.1991) (quoting United States v. Jones, 856 F.2d 146, 150 (11th Cir.1988)). Rule 32 is not implicated when objections are made "merely to the form or tenor of the [presentence report] that are vague and cryptic," or to " 'recommendations, opinions, or conclusions that are not fundamentally factual in nature.' " United States v. Hart, 922 F.2d 613, 615-16 (10th Cir.1990) (quoting United States v. Aleman, 832 F.2d 142, 145 (11th Cir.1987)); see also United States v. Hand, 913 F.2d 854, 857 (10th Cir.1990) (conclusion based on facts in presentence report "is not a finding of fact and [defendant's] argument concerning the appropriate weight and effect to be given the facts surrounding his participation in the drug scheme does not implicate Rule 32(c)(3)(D)"). Juarez also claims that the evidence was insufficient to support the court's conclusion that she was an organizer or leader of marijuana scheme for purposes of enhancing her offense level under U.S.S.G. Sec. 3B1.1. More specifically, Juarez asserts that "the district court incorrectly interpreted the terms 'organizer or leader' in U.S.S.G. Sec. 3B1.1 ... [b]ecause Juarez did not exercise decision making authority over Scally and Gomez...." Appellant's Brief-in-Chief at 12. A defendant's role in the offense is a factual determination which we review for clear error, United States v. Walker, 931 F.2d 631, 636 (10th Cir.1991), and we will reverse only if the district court's finding was without factual support in the record or "we are left with the definite and firm conviction that a mistake has been made." United States v. Beaulieu, 893 F.2d 1177, 1182 (10th Cir.), cert. denied, 497 U.S. 1038 (1990).
 
 
 24
 Section 3B1.1(c) of the Sentencing Guidelines provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity ... increase by 2 levels." The burden of proof is upon the government to show by a preponderance of evidence that the defendant exercised a leadership role. United States v. Mays, 902 F.2d 1501, 1502 (10th Cir.1990) (citations omitted). "In arriving at its determination of a particular defendant's role in the criminal activity, the sentencing court may consider any reliable information, including hearsay." Id. at 1503. Application of the enhancement for a leadership or organizational role requires consideration of the following factors:
 
 
 25
 [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 26
 Commentary, Application Note 3, U.S.S.G. Sec. 3B1.1.
 
 
 27
 The record supports the court's determination that Juarez was a leader or organizer in the marijuana scheme. In United States v. Backas, 901 F.2d 1528, 1530 (10th Cir.), cert. denied, 498 U.S. 870 (1990), we held that the "Section 3B1.1(c) and the term 'supervisor' are satisfied upon a showing that the defendant exercised any degree of direction or control over someone subordinate to him in the distribution scheme." The evidence presented in this case is adequate to support a conclusion by a preponderance of the evidence that Juarez exercised some degree of direction over Gomez. She asked Gomez to drive to Mexico with Scally, where Scally met with Juarez' source, Lorenzo, to discuss a marijuana shipment. She asked Gomez to store the marijuana in her shed and offered to pay her for that storage. She told Gomez on Thanksgiving of 1991 that the shipment was due to arrive any day. Upon these facts, undisputed by Juarez, the district court did not commit clear error in determining that Juarez was a leader or organizer for purposes of section 3B1.1.
 
 
 28
 Juarez next claims that the district court erred in failing to grant her a two-point reduction under the sentencing guidelines for acceptance of responsibility. U.S.S.G. Sec. 3E1.1(a) provides that a defendant is entitled to a two-point reduction in his offense level if he "clearly demonstrates acceptance of responsibility for his offense."
 
 
 29
 We review under a clearly erroneous standard the sentencing court's determination that Juarez was not entitled to a two-point reduction in her offense level for acceptance of responsibility. United States v. Ross, 920 F.2d 1530, 1537 (10th Cir.1990). We accord great deference to the trial court's determination of whether the defendant has accepted responsibility, and will not disturb that determination unless it is without foundation. United States v. Spedalieri, 910 F.2d 707, 712 (10th Cir.1990). The defendant bears the burden of proving by a preponderance of the evidence that she is entitled to a reduction for acceptance of responsibility. United States v. Whitehead, 912 F.2d 448, 450 (10th Cir.1990).
 
 
 30
 Applying these standards, we cannot say that the district court erred in refusing to reduce Juarez' offense level for acceptance of responsibility. It is clear from the record that Juarez attempted to maintain her innocence until after the government had tried its case-in-chief; it was only thereafter that she pled guilty and submitted a written statement in which she claimed that she had earlier denied her guilt under the mistaken belief that because she told her co-conspirators that she "didn't want to be involved," she was not guilty. Her statement does not evince "clearly demonstrated" acceptance of responsibility; rather, it reveals a vague account of the criminal conduct of Scally and Gomez, and essentially portrays Juarez as a bystander. Juarez has thus failed to meet her burden of proving acceptance of responsibility. Giving broad deference to the district court's assessment of the evidence and the witnesses' credibility, we affirm its denial of a two-point reduction.
 
 
 31
 Finally, Juarez asserts that the district court erred in increasing her offense level by two for obstruction of justice under U.S.S.G. Sec. 3C1.1. That section provides that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. Sec. 3C1.1. Our review is for clear error. United States v. Hernandez, 967 F.2d 456, 458 (10th Cir.1992).
 
 
 32
 In this case, the government introduced evidence that on more than one occasion, Juarez warned Gomez that she had better tell investigators a story which Juarez knew was not entirely truthful, and that she offered to pay Gomez for sticking to the story. Juarez did so, quite clearly, to avoid being implicated in the marijuana transaction for which Scally and Gomez were arrested and charged. Included in the Commentary and Application Notes to U.S.S.G. Sec. 3C1.1 is a "non-exhaustive list of examples of the types of conduct to which this enhancement applies," among which is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." Commentary, Application Note 3(a), U.S.S.G. Sec. 3C1.1.[1] We have held that "[a]ttempting to influence a potential witness can form the basis for an upward departure for obstruction of justice." Hernandez, 967 F.2d at 459. Moreover, it is of no consequence that, as Juarez claims, her case was not under investigation at the time she attempted to influence Gomez. Section 3C1.1 enhancements apply "where a defendant attempts to obstruct justice in a case closely related to his own, such as that of a codefendant." United States v. Bernaugh, 969 F.2d 858, 861 (10th Cir.1992). In short, based on this record, we cannot say that the district court's finding that Juarez willfully obstructed or attempted to obstruct justice was clearly erroneous.
 
 
 33
 For the reasons stated above, we AFFIRM the sentence imposed by the district court.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The Commentaries interpret the Guidelines and explain their application. Failure to follow them in applying the Guidelines may constitute reversible error. U.S.S.G. Sec. 1B1.7; Stinson v. United States, 113 S.Ct. 1913, 1918 (1993); United States v. Goddard, 929 F.2d 546, 548 (10th Cir.1991); United States v. Smith, 900 F.2d 1442, 1447 (10th Cir.1990)